**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**September 3, 2020**

# In the Court of Appeals of Georgia

A20A1456. MORMAN v. THE STATE.

DILLARD, Presiding Judge.

Following a trial by jury, Hamond Dontel Morman was convicted of multiple charges related to his participation in the armed robbery of an AT&T store on September 4, 2017. On appeal, Morman's only contention is that the trial court erred by allowing him to be seen by the jury while naked, wrapped in a blanket, shackled, and strapped to a chair. For the reasons set forth *infra*, we affirm.

Morman was originally scheduled to be tried with his two co-defendants, but due to his erratic behavior, the trial court became concerned about his mental health, ordered a psychiatric evaluation, and severed his trial from the others.[1] He was

---

[1] We addressed the appeals of Morman's co-defendants, Melisse Marmon and Rashad Morman, in Case Nos. A20A0366 and A20A0367.

initially found incompetent to stand trial, but was eventually deemed competent to do so. Subsequently, during a pretrial hearing in which the court ensured he wished to proceed *pro se*, Morman declared that the trial court lacked jurisdiction over him because he was a sovereign citizen[2] and indicated that he would not appear at trial. He was then tried before a jury and ultimately convicted of all charges, which included robbery, kidnapping, false imprisonment, possession of a firearm during the commission of a crime, possession of tools to commit a crime, and theft by taking.

From the beginning of his trial, Morman was uncooperative and refused to dress in the street clothes provided to him for court appearances or even in his orange jail-issued jumpsuit. He stated for the record that he was "completely naked" and in a "six-point strapped chair." The trial court asked Morman if he had changed his mind

---

[2] The so-called "sovereign citizen defense" is one in which an individual claims that he or she is not subject to the jurisdiction of courts and government agencies, alleging that the government is illegitimate, and it is a defense that "has no conceivable validity in American law." *Deason v. State*, 348 Ga. App. 514, 515 (823 SE2d 832) (2019) (punctuation omitted); *see Brown v. State*, 346 Ga. App. 245, 247 (4) (816 SE2d 111) (2018) ("Defendants claiming to be 'sovereign citizens' assert that the government is illegitimate and insist that they are not subject to its jurisdiction. The defense has no conceivable validity in American law. Courts have repeatedly rejected such theories of individual sovereignty, immunity from prosecution, and their ilk. Regardless of an individual's claimed status of descent as a 'sovereign citizen,' that person is not beyond the jurisdiction of the courts. These theories should be rejected summarily, however they are presented." (citations & punctuation omitted)).

about not wanting to attend the trial, as he indicated the previous week. Yet again, Morman was uncooperative. He had been picked up from the state mental hospital to attend his trial and received an anti-psychotic shot that would be active for 26 days, including that relevant day of the proceedings. Indeed, the deputies who transported Morman stated that he had been quiet and cooperative during the drive from the hospital to the jail, and that he had been calm and quiet while in the jail.

The trial court concluded that Morman refused to dress for court and noted his previous statement that he did not wish to appear at his own trial. Morman again spoke, saying that he did not wish to appear in court because he was not the person on trial. As a result, the court ordered that Morman be returned to the jail. The court and prosecution subsequently agreed that Morman would be brought to court each morning and after lunch each day, always outside the presence of the jury, so the court could inquire if he had changed his mind about attending trial. The court then proceeded to conduct *voir dire* and later, outside the presence of the jury, brought Morman back into the courtroom to again ask if he had changed his mind about attending trial. Once again, Morman indicated that he did not wish to attend the trial and was returned to jail.

The next day, Morman returned to the courtroom and, upon entering, indicated that he still did not wish to attend his trial. The trial court proceeded to explain what occurred outside of Morman's presence and denied his request for a change of venue. Morman then indicated that he would not respond further and "would remain silent" because, as a sovereign citizen, he was not on trial. So, when the court asked if Morman wished to remain in the courtroom, he did not respond. Specifically, Morman refused to respond further to the trial court's questions after the court said the following:

Mr. Morman, do you wish to remain in the courtroom or go back to the jail?

Mr. Morman, if you do not respond, I am going to assume that you want to remain in the courtroom.

Mr. Morman, we also have street clothes still available to you. I would certainly delay the jury coming into the courtroom until such time that you could dress in normal street clothes. Would you like to do so?

Deputy Sheriff . . . , this morning he is not responding to the Court. Did he voice to you any preference as to whether or not he wanted to stay in the courtroom during the trial of the case or go back to his cell?

4

The deputy sheriff advised the trial court that Morman "said he refused to stay" and that he "would not stay in the courtroom." The court then remarked, "Well, because he's not responding, the [c]ourt is a little bit — not sure if I should remove him from the courtroom or if by not answering he is indicating that he wishes to stay in the courtroom."

The prosecution then reminded the trial court that Morman had already stated, when he entered the courtroom, that he did not wish to be there. The court then responded as follows:

> Well, I did recall when he came into the courtroom, he didn't want to be here, but when I asked him, he has not indicated one way or the other. Before I started my questioning, certainly he acknowledged that when he was coming in the door. He told the deputy he does not wish to be here, but I have asked him and he has not responded so in an abundance of caution, I am going to assume he wishes to remain in the courtroom. If you do not, Mr. Morman, you need to let the Court know. Otherwise, I'm going to bring in the jury and we're going to start the trial today.

Thereafter, with no further response from Morman, the jury was brought into the room. But just prior to that, the trial court ensured Morman was positioned behind the defense table in a manner she believed would block the jury's view of his shackles.

Morman made no statement in objection to remaining in the courtroom or to the jury's view of him. A witnesses then testified, and the State put on the record that Morman "appears to be asleep during a considerable portion of the examination and appears to be asleep now." Then, after the jury left the courtroom, a deputy woke Morman, who still refused to respond to the court's questions.

In the break that followed, while using the restroom, Morman removed the clothes he had been wearing[3] and refused to redress. And after returning to the courtroom, Morman was wrapped in a blanket outside of the jury's presence. The deputy in charge of Morman advised the court that, during the break, Morman expressed that he did not wish to be in the courtroom. The court then directed the deputy to inquire of Morman, on the record, whether he wished to stay in the courtroom, but Morman did not respond. The court was concerned that Morman would not repeat his desire to leave the court on the record and responded as follows:

> It is the [c]ourt's belief that his appearing in the courtroom with a blanket over him would be more prejudicial to him than frankly not being in the courtroom.

---

[3] Morman was presumably dressed in his orange jumpsuit, given that the court previously offered him an opportunity to change into street clothes, which he declined to wear.

Mr. Morman certainly can speak and he is choosing not to speak other than when he's in the private room where the [c]ourt cannot hear him, is that pretty much what is going on here, [Deputy]? Did he have any trouble vocalizing to you anything that he needed?

The deputy replied that Morman had no trouble speaking to him prior to entering the courtroom, but that the deputies "had to physically put him back in the chair" and Morman said "he refused to get back into the chair." So, the court again repeated that Morman was

not telling the [c]ourt anything, although I think it's very prejudicial to him to let him remain in the chair with the blanket on top of him unless he responds to me vocally even though he has indicated that coming into the door this morning and also . . . during the break[,] I feel obligated since he's not voicing an opinion[,] to allow him to remain in the courtroom.

The State's prosecutor then called Morman by the name he claimed was his actual name, "Morman comma Hamond Dontel," and asked if he would like to remain in the courtroom during the trial. Morman replied:

This is not my case. The name that you have, Hamond Dontel Morman, is property. The clothing that you saw me wearing was property. I reveal myself to you as a free man. I am not wearing a

7

blanket. This blanket is draped over me. I am naked. I am a free man. This is what a free man looks like. I am a sovereign citizen.

When the trial court reminded Morman that all of his claims about being a "sovereign citizen" had been dismissed, he replied, "I wasn't talking to you. I am talking to the appellate court. I am speaking beyond you right now, ma'am." He then said that he was "exercising [his] right to remain silent," that he had "already voiced [his] opinion to [the court]," that he would not speak to the court any further, and that he would not respond to the court again, no matter what name it used to address him. Nevertheless, the following colloquy then transpired:

> Court: Do you wish to remain in the courtroom? Let him remain in the courtroom and the jury will see his behavior. I am advising you again that appearing in the courtroom in this fashion before this jury is highly prejudicial.

> Morman: I am still strapped to a chair. Let the record reflect I have been strapped to a chair this entire time.

> Court: And do we have a photograph that we can make part of the record?

> Morman: Let the record reflect there is a video camera in front of me.

A photograph was then taken, and Morman said, "Let the record reflect they're trying to hide what they're doing to me to their jury." A photograph was also taken from what would be the jury's perspective. As this happened, Morman continued to make comments on the record about being "a free man," but he made *no* indication on the record that he did not wish to remain in the courtroom. At that point, the trial court had the jury return with Morman still in the courtroom.

The trial court then instructed the jury as follows:

> I had previously explained to you during the jury selection process and also during my preliminary instructions that the defendant has the right to remain silent and that his silence in the courtroom or at any other time cannot be considered adversely by you during the trial or during your deliberations upon reaching your verdict. Please remember those instructions throughout this trial, The [c]ourt will try to remind you of that as we go through the day.

The trial proceeded for the morning, and the jury was later excused for lunch. At this point, the court indicated that it "made a determination that if [Morman's] not willing to put on clothes, I just really do not think it's very appropriate. I think it is more prejudicial to him being in the courtroom with a blanket over him as opposed to not being in the courtroom." The court then asked the sheriff's department to bring Morman "over right now or [a deputy] was going to use his video cam[era] in the

9

event that [Morman] wishes to make it known through the sheriff's department that he does not wish to come over." The court indicated that it was not "going to let him come back over in a blanket" because it did not think that doing so was appropriate and was "more prejudicial to [Morman] because it's just exhibiting an absolute disregard for the jury." Even so, Morman was returned to the courtroom after again refusing to dress in street clothes and was strapped to his chair so that he would not expose himself by removing the blanket.

The trial court proceeded to tell Morman that "if you put on street clothes, we would be glad to get you out of the chair and let you sit at the defendant's table, which is where you need to be seated." Morman responded that he "[did] not wish to participate in this lynching." At this point, the court determined that Morman had elected not to participate in the trial, ordered his return to the jail, and said it "[did] not intend to bring him back over other than in the event that the jury convicts for sentencing." Nevertheless, the court also ordered that if Morman changed his mind while in the jail, it should be notified immediately and Morman returned to the courtroom in street clothes or his orange jumpsuit because the court would not allow him to return in a blanket. Later, the State admitted into the record photographs and video footage of Morman in his state of undress from earlier in the court proceedings.

10

The court then explained on the record that Morman had been strapped into a chair to bring him into the courtroom so as to not require multiple deputies to physically struggle in doing so.

The photographs in the record show Morman slouched in a high-backed chair with his bare chest exposed and his lower body wrapped in a thick, quilted black blanket. His arms appear to be strapped to the chair at the wrist, but while it is impossible to tell from the photographs whether his legs are shackled, there appears to be no question that they were. The photographs taken from the jury's perspective show only Morman's upper half and do not reveal any portion of his strapped arms or shackled legs because a black cloth or garbage bag was taped around the edges of the defense's table, obscuring the jury's potential view of the lower portion of Morman's body. As a result, all that was visible to the jury was most of Morman's bare upper torso and a small portion of the blanket over the top of the desk.

At the conclusion of trial, after Morman was convicted on all counts, the trial court *sua sponte* requested that appellate counsel be appointed to represent Morman and granted leave to file a late-amended motion for new trial. Morman's motion for new trial was ultimately denied, and this appeal follows.

Morman's sole contention on appeal is that the trial court erred by permitting him to appear before the jury while naked, wrapped in the blanket, and shackled to a chair. For the reasons set forth *infra*, we affirm.

1. We begin with the issue of whether the trial court erred by allowing Morman to appear in the courtroom shackled at the feet and strapped to a chair during trial. But as discussed *supra*, the photographs in the record show that these restraints on Morman were not visible to the jury, and there is no indication that the jury was otherwise made aware of them. As a result, Morman has failed to show that these forms of restraint interfered with his ability to receive a fair trial.[4]

[4] *See Council v. State*, 297 Ga. App. 96, 98 (676 SE2d 411) (2009) ("[T]he evidence showed that the jurors were not able to see [the defendant's] leg shackles from the jury box, and the trial court took steps to keep the jurors unaware of the shackles. As a result, pretermitting whether the trial court correctly determined that the use of leg shackles was warranted by the threat that [the defendant] posed, [the defendant] has failed to show that the shackles interfered with his ability to receive a fair trial. Because the presence of the leg shackles was harmless beyond a reasonable doubt, the trial court's refusal to remove them does not require a reversal of [the defendant's] convictions." (footnotes omitted)); *see also Potts v. State*, 259 Ga. 96, 100 (3) (376 SE2d 851) (1989) (finding no error when, *inter alia*, "[t]he court noted that both counsel tables in the courtroom including the one occupied by the [S]tate and the one occupied by the defense have been draped or covered in such a way that the feet and legs of those seated at those tables are not visible to the jurors" and the defendant "would be brought into the courtroom before the jury entered, and would stay until the jury left" (punctuation omitted)). *Cf. Hill v. State*, Case No. S20A0285, 2020 WL 2108194, at *2-6 (2) (a), (b) (Ga. May 4, 2020) (holding that *pro se* defendant's appearance before the jury in visible handcuffs, waist chain, and

12

2. On the question of whether the trial court erred by permitting the jury to see Morman wrapped in a blanket but otherwise undressed, we likewise discern no error. As detailed *supra*, the trial court struggled valiantly throughout Morman's trial to balance his right to a fair trial, to be present at the proceedings, and to represent himself, when he flatly refused to cooperate by either stating on the record that he did not wish to participate or wear the street clothes offered to him.

To be sure, a criminal defendant has a right to "appear before a jury in civilian clothes,"[5] but that right—like other rights—can be waived.[6] And here, Morman was

_____

leg irons required reversal of conviction when (1) trial court did not consider alternative or less visible measures and (2) the evidence against the defendant was not overwhelming); *McKenzey v. State*, 138 Ga. App. 88, 90 (1) (b) (225 SE2d 512) (1976) (physical precedent only) (reversing conviction when defendant "was seen by some of the panel of prospective jurors as he was led in handcuffs into the courtroom, and no attempt was made by the trial judge to explain to the jury that seeing [the defendant] handcuffed was to have no bearing on its consideration of the merits of the charge against him").

[5] *Johnson v. State*, 243 Ga. App. 891, 892 (1) (534 SE2d 563) (2000); *see United States v. Graham*, 643 F3d 885, 895 (IV) (11th Cir. 2011) ("It is a Fourteenth Amendment violation to compel an accused to stand trial before a jury while dressed in identifiable prison clothes[.]" (punctuation omitted))

[6] *See Johnson*, 243 Ga. App. at 892 (1) ("[T]he right to wear civilian clothing may be waived."); *see also United States v. Shabazz*, 887 F3d 1204, 1219 (II) (C) (11th Cir. 2018) (holding that defendant explicitly waived his right to appear in civil clothing when he refused the opportunity to change); *Graham*, 643 F3d at 895 (IV) ("[T]he failure to make an objection to the court as to being tried in such clothes, for

13

provided with civilian clothes and an opportunity to dress; but he repeatedly declined

that offer. Indeed, when presented with this option, Morman chose instead to undress

and refused to redress, at which point he was wrapped in a blanket so as not to expose

himself in court. So, by his own actions, Morman waived his right to appear in

civilian clothing (or even to appear in his prison jumpsuit after he removed it), and

the trial court did not err by requiring him to appear in court wrapped in a blanket.[7]

Nevertheless, we still need to consider whether the trial court erred by

requiring Morman to remain in the courtroom after he had already advised it that he

did not wish to participate in the proceedings. But before we do so, some additional

---

whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." (punctuation omitted)).

[7] *See Johnson*, 243 Ga. App. at 892-93 (1) (holding that defendant waived the right to appear before the jury in civilian clothing by failing to make a pretrial motion to delay the proceedings until he obtained acceptable clothes and waited until the jury was impaneled before making his objection); *see also Shabazz*, 887 F3d at 1219 (II) (C) (holding that criminal defendant waived objection to appearing in prison attire by his own conduct when he "refused the invitation [to change] and waited until the jury entered the room to object"); *Graham*, 643 F3d at 895 (IV) (holding that criminal defendant waived objection to appearing in prison attire when he told the court he would provide his own street clothes, offered no explanation as to why he appeared in prison attire on the first day of trial, and had no proposal for changing into street clothes without delaying trial).

14

context is needed to fully appreciate the extraordinary difficulties faced by the trial court in this case.

During the pretrial hearing, in which the trial court considered his request to proceed *pro se*, Morman stated on the record, "I won't be here. I do not authorize any attorney or anyone to come here on my behalf. I literally—no one, no one is allowed to be here on my behalf, not even myself. No one is allowed to be here." And in response, the court noted that it would "make available to him an attorney who will be seated behind him during the trial in the event that Mr. Morman has any questions or comments or documents that he needs for the attorney to provide to him." The court also warned Morman—after he repeatedly threatened to walk out of trial—that if he disrupted the proceedings, it would "start doing certain things to prevent that." Specifically, the court explained that, if necessary, it would "end up placing you in another room with the ability to see all of the evidence and hear all of the evidence, and then I would appoint an attorney to start representing you in your absence. But we would make arrangements for you to be able to view and see the trial." To this, Morman responded, "I object to anyone being here on my behalf," and it does not appear from the record that standby counsel was appointed for Morman when he

elected not to participate in the proceedings.[8] Morman does not complain about this

on appeal, and so we are not called upon to address whether such an appointment

should have been made under the particular and unique circumstances of this case.[9]

---

[8] *Cf. Spencer v. State*, 176 Ga. App. 313, 313-14 (335 SE2d 661) (1985) ("In his only enumeration of error the defendant argues that he was denied his right to represent himself at trial [after requesting to proceed *pro se* after the jury was selected]. This contention is without merit. When given the opportunity, the defendant refused to represent himself in any manner. The trial court had no choice but to appoint competent counsel to act on behalf of the defendant. Therefore, in light of the defendant's acts and declarations at trial, we find the trial court did not abuse its discretion in requiring the trial to proceed with appointed counsel."); *Williams v. State*, 169 Ga. App. 812, 814-15 (315 SE2d 42) (1984) (holding that trial court did not abuse its discretion by allowing appointed counsel to provide limited assistance when defendant who objected to appointed counsel, but who did not wish to proceed *pro se*, refused to appear for trial; explaining that the "court permitted the appointed counsel, in accordance with [the defendant's] specific instructions, not to make any statements or arguments on behalf of [the defendant]" but "directed appointed counsel to remain in the court and protect [the defendant's] trial rights insofar as was possible under the limitations imposed by [the defendant] but expressly directed appointed counsel to exercise his best judgment in entering appropriate objections to evidence offered by the state").

[9] *See Clark v. Perez*, 510 F3d 382, 396 (II) (C) (2nd Cir. 2008) ("[We] hold that there was no constitutional violation because [the defendant] knowingly and intelligently waived her right to counsel, unequivocally asserted her right to self-representation, made a conscious strategic choice to waive her right to be present in the courtroom as part of a de facto political protest defense, and was afforded the opportunity to return whenever she chose."); *see also Simpson v. Battaglia*, 458 F3d 585, 597 (II) (B) (2) (7th Cir. 2006) ("The *Faretta [v. California*, 422 U.S. 806 (95 SCt 2525, 45 LE2d 562) (1975),] right and the appointment of standby counsel inherently conflict which, taking into account that hybrid representation is not required, supports the conclusion that there is no right to standby counsel. Certainly

16

But this pre-trial colloquy with Morman further highlights the competing factors the trial court faced.

So, the trial court had before it a defendant proceeding *pro se* who did not wish to appear in the courtroom or participate in his own trial. As a result, and out of an abundance of caution, the court asked Morman to restate his desire to appear at trial or leave the courtroom for the record after the trial commenced, but Morman refused to do so. This was perfectly understandable. As the trial court understood all too well, a criminal defendant is "guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the

---

there is no Supreme Court precedent clearly establishing such a right." (citation omitted)); *United States v. Beckton*, 740 F3d 303, 307 (II) (4th Cir. 2004) ("[A] pro se defendant has no right to standby counsel when he chooses to proceed pro se. It follows, therefore, that a district court has broad discretion to guide what, if any, assistance standby, or advisory, counsel may provide to a defendant conducting his own defense." (citation and punctuation omitted)); *United States v. Mikolajczyk*, 137 F3d 237, 246 (VI) (5th Cir. 1998) ("[A defendant] was constitutionally guaranteed the right to represent himself if he so chose, or to receive competent representation from an attorney, but the availability of standby counsel to provide a combination of the two was not constitutionally required. If [the defendant] had no right to standby counsel, it seems unlikely that standby counsel's failure to assist could be a violation of his Sixth Amendment rights.").

fairness of the procedure."[10] But that right can be waived.[11] And after Morman refused to state on the record whether he still wished to waive this right after the trial commenced, he nevertheless responded to *other* inquiries and made *other* statements on the record. Thus, without an express waiver on the record, the court allowed Morman to appear before the jury while wrapped in a blanket because he refused to dress—although it ultimately concluded that Morman should not remain in court before the jury in such a state because doing so was more prejudicial to his case.

Suffice it to say, the trial court was placed between the proverbial rock and a hard place by Morman's conduct in refusing to dress or state on the record his express desire to waive the right to attend the proceedings. And on the record before us, the trial court may very well have concluded that Morman waived his right to attend the

---

[10] *Lonchar v. State*, 258 Ga. 447, 451-52 (2) (a) (369 SE2d 749) (1988) (punctuation omitted).

[11] *See id.* at 252 (2) (a) ("In the case of non-custodial defendants, the defendant can waive his right to be present by voluntarily absenting himself. A defendant in custody can lose his right to be present by disruptive behavior. . . We hold that a defendant has a right to be present at his trial, but may waive that right, even in a death-penalty case." (citations omitted)); *Anderson v. State*, 238 Ga. App. 866, 873 (3) (519 SE2d 463) (1999) ("A defendant has a right to be present at his trial, but he may waive that right. A defendant waives that right if he voluntarily absents himself from the proceedings." (citation and punctuation omitted)); *see also Coley v. State*, 272 Ga. App. 446, 449 (3) (612 SE2d 608) (2005) ("[The defendant] was voluntarily absent from the trial, and thus he waived his right to be present.").

proceedings at the outset by his disruptive conduct in refusing to dress.[12] But the court admirably did its best to balance Morman's rights to appear in street clothes,[13] represent himself,[14] and be present during his own trial.[15]

[12] *See Illinois v. Allen*, 397 U.S. 337, 343 (90 SCt 1057, 25 LE2d 353) (1970) (explaining that a criminal defendant may waive his right to be present at trial if, "after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom"); *accord Weaver v. State*, 288 Ga. 540, 542-43 (3) (705 SE2d 627) (2011); *see also LaGon v. State*, 334 Ga. App. 14, 19 (2) (778 SE2d 32) (2015) ("In addition to an express waiver of his right to be present at trial, a defendant can implicitly waive his right to be present by conducting himself in a disruptive manner before the trial court or by voluntarily absenting himself from the proceedings.").

[13] *See, e.g.*, *Graham*, 643 F3d at 895 (IV) ("It is a Fourteenth Amendment violation to compel an accused to stand trial before a jury while dressed in identifiable prison clothes[.]" (punctuation omitted)).

[14] *See Faretta v. California*, 422 U.S. 806, 819-20 (III) (A) (95 SCt 2525, 45 LE2d 562) (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.' Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." (footnotes and punctuation omitted)); *Owens v. State*, 298 Ga. 813, 814 (2) (783 SE2d 611) (2016) ("Both the federal and state constitutions guarantee a criminal defendant the right to self-representation. An unequivocal assertion of the right to represent oneself, made prior to trial, should be

19

As a result, under the particular facts and circumstances of this case, we conclude that

_____

followed by a hearing to ensure that the defendant knowingly and intelligently waives the right to counsel and understands the disadvantages of self-representation." (citations omitted)); *see also* U.S. CONST. AMEND. VI ("'In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.'"); GA. CONST. ART. I, SEC. I, PAR. XII ("No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state.").

[15] *See Allen*, 397 U.S. at 337 ("The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that: 'In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.' We have held that the Fourteenth Amendment makes the guarantees of this clause obligatory upon the States." (punctuation omitted)); *LaGon*, 334 Ga. App. at 19 (2) ("Under the Sixth Amendment to the United States Constitution, a criminal defendant has the right to be present in the courtroom at all critical stages of his trial. Similarly, the Georgia Constitution affords a criminal defendant the right to be present at every stage of the proceedings materially affecting his case." (citations omitted)); *see also* U.S. CONST. AMEND. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."); GA. CONST., ART. I, SEC. I, PAR. XII ("No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state.").

the trial court did not abuse its discretion when Morman appeared before the jury in the manner previously described for a brief portion of his multi-day trial.[16]

For all these reasons, we affirm the trial court's denial of Morman's motion for new trial.

*Judgment affirmed. Rickman and Brown, JJ., concur.*

---

[16] *Cf. Joyner v. State*, 278 Ga. App. 60, 65 (4) (c) (628 SE2d 186) (2006) (holding that "[i]n light of [the defendant's] repeated, confusing, and inconsistent decisions regarding whether he wished to represent himself or not throughout the course of this litigation, we cannot say that the trial court abused its discretion in refusing to allow yet another attorney to withdraw from representation of [the defendant]").